**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**February 26, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

RAMON ZAMORA,

  Plaintiff - Appellant,

v.

ELITE LOGISTICS, INC.,

  Defendant - Appellee.

_____

KANSAS HISPANIC & LATINO
AMERICAN AFFAIRS
COMMISSION; HISPANIC
MINISTRY FOR THE
ARCHDIOCESE OF KANSAS CITY,
KANSAS; EL CENTRO, INC.;
APOYO TRABAJADOR DE
LAWRENCE/MIGRANT WORKER
SOLIDARITY OF LAWRENCE;
HARVEST AMERICA
CORPORATION; NATIONAL
IMMIGRATION LAW CENTER, EL
CENTRO, INC.; INTERFAITH
WORKER JUSTICE;
INTERNATIONAL BROTHERHOOD
OF TEAMSTERS; KANSAS CITY
WORKER JUSTICE PROJECT;
LABORERS INTERNATIONAL
UNION OF NORTH AMERICA;
NATIONAL COUNCIL OF LA
RAZA; SERVICE EMPLOYEES
INTERNATIONAL UNION; UNITED
FOOD AND COMMERCIAL
WORKER'S UNION,

No. 04-3205

Amici Curiae.

---

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 03-CV-2230-JWL)**

---

Christopher Ho, The Legal Aid Society-Employment Law Center, San Francisco, California (William N. Nguyen and Sharon Terman, The Legal Aid Society-Employment Law Center, San Francisco, California, and Aldo Caller, Law Offices of Aldo C. Caller, Shawnee Mission, Kansas, with him on the briefs), for Plaintiff-Appellant Ramon Zamora.

Ryan B. Denk (Carl A. Gallagher, with him on the briefs), McAnany, Van Cleave & Phillips, P.A., Kansas City, Kansas, for Defendant-Appellee Elite Logistics, Inc.

Marielena Hincapie, National Immigration Law Center, Los Angeles, California, on the brief for Amici Curiae National Immigration Law Center; El Centro, Inc.; Harvest America Corporation; Interfaith Worker Justice; International Brotherhood of Teamsters; Kansas City Worker Justice Project; Laborers International Union of North America; National Council of La Raza; Service Employees International Union; United Food and Commercial Workers Union.

---

Before **TACHA**, Chief Judge, **HOLLOWAY**, **EBEL**, **KELLY**, **HENRY**, **BRISCOE**, **LUCERO**, **MURPHY**, **HARTZ**, **O'BRIEN**, **McCONNELL**, **TYMKOVICH**, **GORSUCH**, and **HOLMES**, Circuit Judges.

---

**EBEL**, Circuit Judge.

---

Plaintiff-Appellant Ramon Zamora sued his former employer, Defendant-Appellee Elite Logistics, Incorporated ("Elite"), under Title VII of the Civil Rights Act, alleging Elite discriminated against Zamora because of his race

2

and national origin 1) by suspending Zamora from work until he presented documentation establishing his right to work in the United States; and 2) then, after reinstating Zamora, firing him after he requested an apology. The district court granted Elite summary judgment on both claims. See Zamora v. Elite Logistics, Inc., 316 F. Supp. 2d 1107 (D. Kan. 2004). A divided panel of this court reversed that decision. See Zamora v. Elite Logistics, Inc., 449 F.3d 1106 (10th Cir. 2006). After rehearing this appeal en banc, this court VACATES the panel's decision. See 10th Cir. R. 35.6. As to Zamora's first claim involving Zamora's suspension, because the en banc court is evenly divided, we simply AFFIRM the district court's decision granting Elite summary judgment.[1] As to the second claim involving Zamora's termination, a majority of this court AFFIRMS summary judgment in Elite's favor.[2]

## I. BACKGROUND

Viewing the evidence in the light most favorable to Zamora, see Metzler v. Fed. Home Loan Bank, 464 F.3d 1164, 1166 n.1 (10th Cir. 2006), the evidence in the record established the following: Elite operates a grocery warehouse in Kansas City, Kansas. In June 2000, Elite needed to hire an additional 300

---

[1]Judges Tacha, Kelly, Hartz, O'Brien, McConnell, Tymkovich and Gorsuch vote to AFFIRM on the suspension claim. Judges Holloway, Ebel, Henry, Briscoe, Lucero, Murphy and Holmes vote to REVERSE.

[2]Judges Tacha, Ebel, Kelly, Hartz, O'Brien, McConnell, Tymkovich, Gorsuch and Holmes vote to AFFIRM on the termination claim.

3

workers in just a few weeks' time. In doing so, Elite failed to verify that all of its new employees were authorized to work in the United States.

A year later, in August 2001, Elite hired Zamora. At that time, Zamora was a Mexican citizen who had been a permanent legal resident of the United States since 1987. As part of the hiring process and in compliance with the Immigration Reform and Control Act of 1986 ("IRCA"), Zamora showed Elite his social security card, which he had had since 1980 or 1981, and his alien registration card. Zamora also filled out an I-9 form truthfully indicating that he was a Mexican citizen and a lawful permanent resident of the United States.

Four months after hiring Zamora, in December 2001, Elite received a tip that the Immigration and Naturalization Service (INS)[3] was going to investigate warehouses in the area. Elite was particularly concerned about such an investigation in light of its earlier hiring practices in June 2000. Elite, therefore, hired two independent contractors to check the social security numbers of all 650 Elite employees. This investigation indicated that someone other than Zamora had been using the same social security number that he was using.[4] The

---

[3]The INS no longer exists. In March 2003, its duties were transferred to the Department of Homeland Security. Yerkovich v. Ashcroft, 381 F.3d 990, 991 n.2 (10th Cir. 2004).

[4]In January 2002, one of the independent contractors, Datasource, reported to Elite that a Manuel Dominguez, while working in California, had used the same social security number as Zamora. Elite then asked the second independent contractor, Verifications, Inc., to recheck Zamora's social security number. In

(continued...)

4

investigation turned up similar problems with thirty-five other employees' social security numbers.

On May 10, 2002, therefore, Elite's human resources manager, Larry Tucker, met specifically with Zamora and gave him an "Important Memorandum," written in Spanish and English, giving him ten days to produce adequate documentation of his right to work in the United States. Tucker followed this same procedure with the other thirty-five employees whose social security numbers raised concerns.[5] The memorandum Tucker gave Zamora and the other affected workers read:

> It is required by federal law that all employees produce documents, which establish their identity and/or employment eligibility to legally work in the United States when they are hired. This eligibility can be established with a US Passport, a Certificate of Citizenship or Naturalization; or with a combination of other documents, such as a state's driver's license, state or federal ID card, US Social Security card and/or a certified copy of a birth certificate, issued by a state of the United States.
>
> It has come to our attention that the documents you provided us previously are questionable. Therefore, we are asking that you obtain proper documentation, or you may not be permitted to continue working here. Please bring proper evidence of your identity and employment eligibility no later than 5:00 p.m. on Monday, May

---

[4](...continued)
March 2002, Verifications, Inc. reported to Elite that a Manuel Dominguez had also used the same number to obtain credit.

[5]Most of these thirty-five employees, when asked for this documentation, just quit. Only Zamora eventually provided paperwork verifying his right to work in the United States.

20, 2002, to the Department of Human Resources, or you may be terminated.

Thank you.

At the bottom of this memorandum there was a place where Zamora indicated that

> I understand and agree that until and if I provide documents, which establish my identity and/or employment eligibility to legally work in the United States, Elite Logistics may not be able to continue permitting me to work. I also understand and agree that I have until 5:00 p.m. on Monday, May 20, 2002, to produce this documentation.

Zamora signed and dated that section of the memorandum. Zamora testified in his deposition that he understood at that time that he needed to bring in a valid social security card and documents establishing that he had a right to work in the United States. Zamora continued working during this ten-day period.

Zamora did not present Elite with any of the requested documents by May 20, 2002. Therefore, Tucker again met with Zamora[6] and, according to Zamora, Tucker told him that he could not "come to work anymore until you got a different Social Security number." Zamora left Tucker's office and returned that same day with a document from the Social Security Administration showing wage earnings for the years 1978-85 for an "R. Zamora" under Zamora's social security number.[7] This document had been mailed to an address in Washington, which

---

[6]Union steward Ray Puentes was at this meeting between Tucker and Zamora and acted as a translator between the two.

[7]Zamora testified at his deposition that he had had his social security number only since 1980 or 1981. Yet this earnings statement showed wages

(continued...)

6

Zamora had scratched out and replaced with his then-current Missouri address. More problematic, however, was that the date of birth for R. Zamora on this earnings statement was different than the date of birth Ramon Zamora had given Elite at the time Elite hired him. After reviewing the earnings statement, Tucker became concerned that yet a third individual had been using Zamora's social security number. Therefore, Tucker informed Zamora that this earnings statement was not "acceptable." Neither was an INS document Zamora showed Tucker that indicated that Zamora had previously applied to become a United States citizen.

At some point, Zamora also showed Tucker his naturalization certificate, indicating that Zamora had in fact become a naturalized citizen of the United States. But Tucker rejected that document as well.

The next day, May 23, Zamora brought Tucker a statement from the Social Security Administration indicating that the social security number Zamora had given Elite was in fact his number. Tucker then told Zamora that "[w]e will check this out ourselves. And if it checks out, you can come back to work." Tucker's assistant verified this document's authenticity and then called Zamora, asking him to return to work on May 29.

---

[7](...continued)
earned beginning in 1978. At his deposition, Zamora acknowledged that this earnings information was incorrect, but explained that when he had obtained this earning statement a few years earlier, he had then contacted the Social Security Administration to correct this error.

7

On May 29, however, instead of returning to work, Zamora went to Tucker's office and handed him a letter stating that "[b]efore I could consider going back to work I need from you two things: 1) an apology in writing, and 2) a complete explanation of why I was terminated. Please send a response to my home." Tucker refused to apologize. Tucker may then have told Zamora to get out of Tucker's office or the building, or to "[j]ust get the hell out." According to Zamora, Tucker also told him he was fired.

Zamora sued Elite, alleging the company violated Title VII[8] by first suspending and then firing Zamora because of his race and national origin. See 42 U.S.C. § 2000e-2(a)(1). The district court granted Elite summary judgment on both claims. See Zamora, 316 F. Supp. 2d at 1119, 1121. Zamora appealed.

## II.    STANDARD OF REVIEW

This court reviews summary judgment decisions de novo, viewing the evidence in the light most favorable to the non-moving party; in this case, in Zamora's favor. See Metzler, 464 F.3d at 1166 n.1. Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

---

[8]42 U.S.C. §§ 2000e to 2000e-17.

8

## III.  DISCUSSION

In alleging that Elite discriminated against him on the basis of his race and national origin, Zamora challenges two separate incidents: 1) Elite's suspending Zamora from work until he was able to produce documentation establishing his right to work in the United States; and 2) after Elite reinstated him, Elite's decision to fire Zamora after he requested an explanation and an apology.  See Zamora, 316 F. Supp. 2d at 1114.

### A.  Suspension

The district court granted Elite summary judgment on the suspension claim, after applying McDonnell Douglas's burden-shifting analysis[9] and concluding that Zamora had established a prima facie discrimination claim, but that Elite had proffered a legitimate, nondiscriminatory reason for suspending Zamora, and Zamora had failed to create a triable issue of fact as to whether or not Elite's proffered justification was merely a pretext for discrimination.  See Zamora, 316 F. Supp. 2d at 1116-21.  A divided panel of this court reversed that decision, determining that Zamora had presented sufficient evidence to create a triable fact as to whether Elite's stated reason for requiring Zamora to produce this documentation–that Elite was trying to avoid INS sanctions–was merely a pretext for race and national origin discrimination.  See Zamora, 449 F.3d at 1112-13.

---

[9]McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973).

9

After rehearing en banc, this court is evenly divided on this issue. For that reason, we simply VACATE the earlier panel opinion and AFFIRM the district court's decision granting Elite summary judgment on this claim. See Peoples v. CCA Detention Ctrs., 449 F.3d 1097, 1099 (10th Cir.) (per curiam), cert. denied, 127 S. Ct. 664, 687 (2006); Zuni Pub. Sch. Dist. No. 89 v. United States Dep't of Educ., 437 F.3d 1289, 1290 (10th Cir.) (per curiam), cert. granted, 127 S. Ct. 36 (2006).

## B.    Termination

Zamora also alleged that Elite discriminated against him on the basis of his race and national origin when Elite fired Zamora after he requested an apology. See Zamora, 316 F. Supp. 2d at 1114, 1119. The district court granted summary judgment to Elite on this claim, after concluding that Zamora had established a prima facie discrimination claim, but that Elite had proffered a legitimate, nondiscriminatory reason to fire him, and that Zamora had failed to assert sufficient evidence to create a triable issue as to whether or not Elite's proffered reason was merely a pretext for discrimination. See id. at 1119-21. A majority of the en banc court agrees.

For purposes of his appeal, we assume that Zamora did establish a prima facie discrimination claim. See Annett v. Univ. of Kan., 371 F.3d 1233, 1235, 1237 (10th Cir. 2004) (assuming, without deciding, that plaintiff has established prima facie retaliation claim actionable under Title VII); see also McCowan v. All

10

Star Maintenance, Inc., 273 F.3d 917, 923 (10th Cir. 2001). Further, Zamora concedes that Elite asserted a legitimate, nondiscriminatory reason for firing Zamora–its human resources manager, Tucker, believed that Zamora would not return to work unless Tucker apologized, and Tucker refused to apologize. Elite's proffered justification was sufficient for Elite to meet its "exceedingly light" burden under McDonnell Douglas and shift the burden back to Zamora to show that Elite's proffered justification was merely a pretext for race and national origin discrimination. Goodwin v. Gen. Motors Corp., 275 F.3d 1005, 1013 (10th Cir. 2002). "A plaintiff demonstrates pretext by showing either that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence." Stinnett v. Safeway, Inc., 337 F.3d 1213, 1218 (10th Cir. 2003) (quotation omitted).

Zamora argues that Elite's proffered reason for terminating Zamora was not worthy of belief because Tucker could not have reasonably believed that Zamora had actually conditioned his return to work on Zamora apologizing. "In determining whether the proffered reason for a decision was pretextual, we examine the facts as they appear to the person making the decision." Watts v. City of Norman, 270 F.3d 1288, 1295 (10th Cir. 2001) (emphasis added; quotations omitted); see also Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1231 (10th Cir. 2000). And the undisputed evidence in this case establishes that, although Elite informed Zamora he could return to work on May 29, Zamora

11

did not return to work but instead went to Tucker's office and gave him the letter. And that letter specifically stated that "[b]efore I could consider going back to work I need from you two things: 1) an apology in writing, and 2) a complete explanation of why I was terminated.  Please send a response to my home." (Emphasis added).  Further, because Zamora had asked that Tucker's written apology be sent to his home, Tucker could have reasonably believed that Zamora was not going to return to work on May 29, as Elite had requested.  Based upon these undisputed facts known to Tucker, he could reasonably have believed that Zamora was not going to return to work unless Tucker apologized.[10]  See Kendrick, 220 F.3d at 1230-32 (holding that, although there was a disputed issue of fact as to whether or not the terminated employee had actually pushed his supervisor, the terminated employee had failed to establish that this proffered reason for his firing was a pretext for discrimination where the decisionmaker had no evidence contradicting the report that the employee did push his supervisor);

---

[10]At various places in the record, Zamora asserts that he would, and that he would not, have returned to work even without Tucker's apology.  But Zamora's subjective intent is not relevant to the question of how the facts objectively appeared to Tucker, as the decisionmaker.  See Watts, 270 F.3d at 1295.  "The pertinent question in determining pretext is not whether the employer was right . . . but whether that belief was genuine or pretextual."  Pastran v. K-Mart Corp., 210 F.3d 1201, 1206 (10th Cir. 2000).  The district court actually disregarded Zamora's affidavit, filed after his deposition, indicating Zamora would have continued working even without an apology.  See Zamora, 316 F. Supp. 2d at 1113 n.4.  This affidavit contradicted Zamora's earlier deposition testimony that he would not have returned to work without an apology.

12

Gearhart v. Sears, Roebuck & Co., 27 F. Supp. 2d 1263, 1276-77 (D. Kan. 1998) (holding that, even if there was a disputed issue of fact as to whether or not the employee intended to resign, summary judgment for the employer was appropriate where the employer "reasonably believed that employee resigned, and employee failed otherwise to offer sufficient evidence that employer's asserted reason was pretextual), aff'd, 194 F.3d 1320 (Table) (10th Cir. 1999) (unpublished).

Zamora argues that Tucker's strong reaction to Zamora's request for a written apology and explanation indicates that his proffered reason for terminating Zamora was a pretext for his true discriminatory motive. Zamora testified that when he gave Tucker the letter requesting a written explanation and apology, Tucker grabbed it out of Zamora's hand and told Zamora he was fired "because [Tucker] was not apologizing to anybody."  But there is simply no evidence in the record indicating that Tucker's reaction was because Zamora was a Mexican-born Hispanic.  In fact, the evidence indicates just the opposite.  Once Zamora provided Elite with documentation indicating that he was eligible to work in the United States, and that the social security number he was using was his, Tucker offered Zamora his job back.  If Tucker was discriminating against Zamora based upon his race or national origin, Tucker would not have reinstated him.  Cf. Antonio v. Sygma Network, Inc., 458 F.3d 1177, 1183 (10th Cir. 2006) (holding "where the employee was hired and fired by the same person within a relatively short time span, there is a strong inference that the employer's stated

13

reason for acting against the employee is not pretextual;" noting, however, that an employee can still "present countervailing evidence of pretext") (quotation, footnote omitted). There is nothing in the record to suggest that Tucker was not going to permit Zamora to return to work on May 29; in fact, the undisputed evidence indicates that Zamora could have returned to work that day. Under the facts of this case, then, Tucker's suspending Zamora and his later decision to terminate Zamora's employment must be viewed as discrete, separate events. Tucker did not terminate Zamora until Zamora requested a written explanation and apology as a condition for his returning to work. And even Zamora concedes that Elite had no legal obligation to apologize. We agree with that. Nor is there any suggestion that Tucker had ever treated similarly situated employees who were not Hispanic or Mexican-born any differently. See generally Kendrick, 220 F.3d at 1230 (noting that one way an employee might prove pretext is to show that the employer treated similarly situated employees differently). Because Zamora failed to present sufficient evidence establishing a genuinely disputed issue of fact as to whether or not Elite's proffered reason for firing Zamora was a pretext for discrimination, summary judgment for Elite was warranted on this claim.

14

**IV.    CONCLUSION**

For the foregoing reasons, we VACATE the earlier panel decision, 449 F.3d 1106, and AFFIRM the district court's decision granting Elite summary judgment on both claims.

04-3205 - *Zamora v. Elite Logistics, Inc.*

**HARTZ**, Circuit Judge, concurring, joined by Tymkovich, Circuit Judge.

I join Judge Ebel's opinion. I continue to believe that we should not apply the framework of *McDonnell Douglas*, 411 U.S. 792 (1973), to review a summary judgment when the existence of a prima facie case is not disputed. *See Wells v. Colo. Dept. of Trans.*, 325 F.3d 1205, 1221-28 (10th Cir. 2003) (Hartz, J., concurring). Applying that framework is inconsistent with Supreme Court authority, adds unnecessary complexity to the analysis, and is too likely to cause us to reach a result contrary to what we would decide if we focused on "the ultimate question of discrimination *vel non*." *U. S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714 (1983). Neither party, however, has suggested that we not apply the *McDonnell Douglas* framework, so this is not the appropriate case to address the issue.

*Zamora v. Elite Logistics*, 04-3205.

**McCONNELL**, Circuit Judge, concurring and concurring in the judgment, joined by **KELLY**, **O'BRIEN**, and **TYMKOVICH**, Circuit Judges, joined by **GORSUCH**, Circuit Judge, except for the last paragraph of Section III, and joined in Section V by **HOLMES**, Circuit Judge.

Plaintiff Ramon Zamora presents two claims of employment discrimination, both arising out of his employer's efforts to ensure that every member of its workforce was legally authorized to work in the United States. Mr. Zamora's first claim relates to his three-day suspension, which occurred after Mr. Zamora failed to respond to the employer's notice of apparent problems with his Social Security number ("SSN"). The suspension continued after he presented an additional Social Security document containing yet another discrepancy—a birth date different from the one he had earlier reported to the employer. Mr. Zamora's second claim relates to his dismissal, which occurred after he obtained and provided documentation from the Social Security Administration verifying his SSN, but also demanded an apology before returning to work. The majority of this Court holds that the second claim cannot survive summary judgment because Mr. Zamora failed to present any evidence suggesting the termination was motivated by his national origin. I believe the same reason compels affirmance of summary judgment on his suspension claim. I therefore concur in the result of the equally-divided Court regarding this claim and write separately to explain my reasons.

# I.

Because this case arises on appeal from a grant of summary judgment, we must view the evidence in the light most favorable to the non-moving party, Mr. Zamora. That does not mean, however, that we may disregard undisputed evidence that favors the moving party. The dissenting opinion depicts a hapless employee repeatedly offering sound documentation of his work status, and just as often being senselessly (or invidiously) rebuffed. That is scarcely a fair description of what occurred.

In June 2000, Elite Logistics, Inc., ("Elite") confronted a worker strike that necessitated the rushed hiring of about three hundred replacement employees for its Kansas Avenue grocery warehouse in Kansas City, Kansas. In the course of this scramble, Elite failed to obtain from its new hires the employment eligibility documentation required by the Immigration Reform and Control Act of 1986 ("IRCA"). *See* 8 U.S.C. § 1324a(b). In August 2001, after the crisis had passed and normal hiring practices resumed, Elite hired Mr. Zamora, who presented Elite with his alien registration and Social Security cards and signed an I-9 Employment Eligibility Verification form, as required by IRCA. *Zamora v. Elite Logistics, Inc.*, 316 F.Supp.2d 1107, 1111 (D. Kan. 2004).

Four months later, in December 2001, Elite learned of a possible inspection of the Kansas Avenue facility by the Immigration and Naturalization Service ("INS"). Recognizing that its post-strike hiring frenzy might have compromised

-2-

Elite's IRCA compliance, the company's human resource manager, Larry Tucker, decided to verify the Social Security numbers of every worker at the facility, approximately 650 in total. Mr. Tucker hired two independent agencies to perform these verifications. Between January and March 2002, Elite received reports that 35 to 40 employees had problems with their SSNs. These employees included Mr. Zamora, whose proffered SSN had previously been used by a "Manuel Dominguez" for employment purposes in California in 1989, 1995, and 1997. Appellee's App. at 94, 96. Mr. Tucker resubmitted most or all the problematic SSNs to a second company for rechecking. Tucker Dep. at 32–33, 42–44.[1] In March 2002, this second company reported that Manuel Dominguez had used this number for credit purposes as recently as October, 2001. *Zamora*, 316 F.Supp.2d at 1111; Appellee's App. at 95, 97.

To each employee with a reported SSN problem, Elite issued a memorandum explaining that federal law requires "all employees produce documents, which establish their identity and/or employment eligibility to legally work in the United States." Appellant's Supp. App. at 87. The memorandum further explained that "[t]his eligibility can be established with a US Passport, a Certificate of Citizenship or Naturalization; or with a combination of other

---

[1] Mr. Tucker's deposition is found in the Appellant's Supplemental Appendix at pages 45–82. Mr. Zamora's deposition is found in the same appendix at pages 30–44.

documents, such as a state driver's license, state or federal ID card, US Social Security card and/or a certified copy of a birth certificate, issued by a state of the United States." *Id.* The memorandum then informed each recipient that documents previously provided by the employee were "questionable" and requested that the employee provide "proper evidence of . . . identity and employment eligibility." *Id.* The memorandum issued to Mr. Zamora warned that such documentation must be provided by "5:00 p.m. on Monday, May 20, 2002 . . . or you may be terminated." *Id.* Mr. Tucker provided Mr. Zamora with this memorandum on May 10, 2002. Mr. Zamora signed the bottom portion of the memorandum, attesting that "I understand and agree that until and if I provide documents, which establish my identify and/or employment eligibility to legally work in the United States, Elite Logistics may not be able to continue permitting me to work." *Id.*

Mr. Tucker testified that of the thirty-five employees who received the memorandum, most simply disappeared. Tucker Dep. at 36, 55. None but Mr. Zamora ever attempted to provide documentation. *Id.* at 36–37, 54–55.

At first, even Mr. Zamora did not respond to the memorandum. On May 22, 2002—two days after the deadline specified for response—Mr. Tucker summoned Mr. Zamora, along with Mr. Zamora's union steward (who also served as a translator), to his office. At that meeting, Mr. Tucker informed Mr. Zamora that he had failed to produce the requested documentation and suspended him

from employment until such documentation was forthcoming. The union steward accused Mr. Tucker of picking on Hispanic employees, an assertion that both Mr. Tucker and the district court assumed the steward translated on Mr. Zamora's behalf. *Id.* at 58; *Zamora*, 316 F.Supp.2d at 1112.

What happened next is the subject of some dispute among the parties, but the district court characterized it as follows:

> On or about May 22, 2002, plaintiff brought Mr. Tucker a document from the INS showing he had applied for naturalization in 2001. Along with this document were earnings records from the Social Security Administration showing the use of plaintiff's SSN by someone named "R. Zamora" and whose date of birth was "2/1960." The document that plaintiff had provided to defendant when he was hired, however, showed his date of birth to be June 14, 1961. Mr. Tucker became even further concerned about plaintiff's SSN when he noticed the different birth dates. Mr. Tucker expressed these concerns to plaintiff and informed plaintiff that he would need to bring in further documentation to establish his right to work. The INS form provided a customer service number, but Mr. Tucker did not call that number.
>
> Plaintiff testified in his deposition that on or about May 22, 2002, he presented Mr. Tucker with his naturalization certificate and told Mr. Tucker he was now a United States citizen. Mr. Tucker, however, did not accept this paperwork as adequate. He told plaintiff he did not care about this but instead wanted social security papers or another SSN. Mr. Tucker told plaintiff not to come to work until he got a different SSN. Plaintiff testified in his deposition that he also presented Mr. Tucker with his social security card, that Mr. Tucker told him his SSN was stolen from someone else, and that Mr. Tucker treated him rudely in rejecting his documentation.

*Zamora*, 316 F.Supp.2d at 1112–13.[2]

_____

[2] The dissent claims that Mr. Zamora presented his naturalization certificate
(continued...)

Elite contends that the record does not support Mr. Zamora's claim that he presented Mr. Tucker with a naturalization certificate.[3] Elite points out that no such certificate appears in the record; the only document in the record regarding

---

[2](...continued)
at a meeting separate and apart from the meeting at which he presented the questionable Social Security earnings report and naturalization interview notice. Dissenting Op. at 6. The dissent does not explain the evidentiary basis for this inference. Neither Mr. Zamora nor Mr. Tucker mentioned such a meeting in their depositions.

[3] Mr. Tucker denied receiving a naturalization certificate from Mr. Zamora. As he described the relevant events, he called Mr. Zamora into his office on May 22 to inform him that he could not continue working at Elite until he provided the documentation requested on May 10. When asked whether Mr. Zamora brought any documents at that time, Mr. Tucker responded: "Not right then." Tucker Dep. at 55.
Mr. Tucker explained that Mr. Zamora returned "either that day or the next," *id.* at 66, with (1) "documents that were issued by the Immigration and Naturalization Service" showing that Mr. Zamora had applied for naturalization, and (2) Social Security wage records which "had the same social security number, but it had a different birthdate than the one he was using," *id.* at 61. It thus appeared to Mr. Tucker "as if even a third employee or a third individual may have been using that number." *Id.* When asked whether Mr. Zamora brought any other documents during that visit, Mr. Tucker responded: "It is my recollection that this is all he presented me with." *Id.* at 66.
Mr. Tucker testified that his next interaction with Mr. Zamora occurred when the latter brought in a document stamped by the Social Security Administration (discussed *infra*). When asked whether Mr. Zamora "brought any additional documents" to that meeting, Mr. Tucker responded: "I do not recall." *Id.* at 69.
When Mr. Zamora's attorney directly questioned Mr. Tucker about the naturalization certificate, the following exchange ensued:
Q. Okay. Do you recall if [Mr. Zamora] ever brought to you a certificate of naturalization?
A. He did not.
Q. You recall that he did not?
A. Yes sir.
*Id.* at 90–91.

Mr. Zamora's naturalization, marked Exhibit 6, is an INS notice addressed to Mr. Zamora instructing him to attend a hearing on his application for naturalization. Appellant's Supp. App. at 88. Mr. Zamora did, however, testify in his deposition that he presented a naturalization certificate to Mr. Tucker. Zamora Dep. at 42. Because this Court must view the evidence in the light most favorable to the nonmoving party, and because a party's deposition testimony, even if uncorroborated by relevant documents, counts as evidence, we must assume for purposes of this appeal that Mr. Zamora presented a naturalization certificate to Mr. Tucker. However, nothing in the record suggests—and, therefore, we need not assume—that the naturalization certificate ameliorated Mr. Tucker's concerns about the problems with Mr. Zamora's SSN. Indeed, so far as the record reveals, Social Security numbers do not appear on naturalization certificates, and when asked whether his SSN appeared on the "citizenship papers" he presented to Mr. Tucker, Mr. Zamora responded: "I don't think so. I can't remember. No, I don't think so." *Id.* at 11–12.

Mr. Zamora returned the day following his suspension with a document from the Social Security Administration ("SSA"), dated May 23, 2002. This document stated that Mr. Zamora's SSN was assigned to an individual named "Ramon Zamora Farias," which corresponded with the name Mr. Zamora provided to Elite when originally hired. Mr. Tucker instructed his secretary to verify this documentation with the SSA and to summon Mr. Zamora back to work if it

checked out. The document did check out and, on May 25, Mr. Tucker's secretary called Mr. Zamora and asked him to return to work. *Zamora*, 316 F.Supp.2d 1113. The suspension thus lasted about three days.

On or about May 29, Mr. Zamora returned to Elite and handed Mr. Tucker a letter written in English and typed at the office of his attorney. Zamora Dep. at 13. It stated: "Before I could consider going back to work I need from you two things: 1) an apology in writing, and 2) a complete explanation of why I was terminated." Appellant's Supp. App. at 101. Mr. Tucker testified that he considered this a voluntary resignation. Tucker Dep. at 82. Mr. Zamora testified that Mr. Tucker grabbed the letter, stated that he would fire Mr. Zamora rather than give an explanation, and told Mr. Zamora he was fired. Zamora Dep. at 34–36. Mr. Tucker admitted that he might have told Mr. Zamora to "just get the hell out." Tucker Dep. at 96.

## II.

Mr. Zamora has sued under Title VII of the Civil Rights Act of 1964, which makes it unlawful "for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII cases are funneled through the oft-repeated *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*,

411 U.S. 792 (1973).[4] Under this formula, a Title VII plaintiff first must establish a prima facie case of discrimination—a burden so light that only the most baseless of claims fails to satisfy it.[5] The heavy lifting of proving and defending a Title VII case occurs in the later stages of the *McDonnell Douglas* analysis.

After a plaintiff has established a prima facie case, the burden "shift[s] to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas*, 411 U.S. at 802. If the employer does so, the burden shifts back to the plaintiff to show that the proffered reason is

---

[4] Judge Hartz offers arguments against employing the *McDonnell Douglas* framework in the summary judgment context. Those arguments were not made by any party and have not received the consideration of the *en banc* court. Nothing in the opinions in this case should be interpreted as precluding parties in future cases from litigating the issues Judge Hartz raises.

[5] In a discriminatory discharge case, all a plaintiff must show is: (1) he belongs to a protected class; (2) he was qualified for his job; (3) despite his qualifications, he was discharged; and, (4) the job was not eliminated after his discharge. *English v. Colo. Dept. of Corrections*, 248 F.3d 1002, 1008 (10th Cir. 2001). This Circuit has held that the requirements for a prima facie case in a discriminatory suspension case are different than those for a discriminatory discharge case, a difference that perhaps gives the first step of the *McDonnell Douglas* framework a bit more bite in the former context. A plaintiff attempting to prove discriminatory suspension must show that (1) he belongs to a protected class, (2) he suffered an adverse employment action, and (3) "the adverse employment action occurred under circumstances giving rise to an inference of discrimination." *Hysten v. Burlington N. & Santa Fe Ry. Co.*, 296 F.3d 1177, 1181 (10th Cir. 2002). Although the posture of this case demands that we analyze the evidence under the later stages of the *McDonnell Douglas* framework, with regard to Mr. Zamora's first claim, it is not clear that he presented enough evidence to pass even this first step.

pretextual. One way a plaintiff can do so is by demonstrating "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'" *Danville v. Reg'l Lab Corp.*, 292 F.3d 1246, 1250 (10th Cir. 2002) (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)). When analyzing this type of evidence, it must be kept in mind that the purpose of the *McDonnell Douglas* framework is to ferret out discrimination where direct evidence of such is lacking. The framework allows a factfinder to draw reasonable inferences from circumstantial evidence. As the Supreme Court has explained, "[i]n appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000). "Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* at 148.

But not all evidence of pretext is sufficient to propel a case past a summary judgment challenge. Some circumstantial evidence simply does not provide enough proof to allow a reasonable factfinder to draw an inference of discrimination. As the *Reeves* Court cautioned:

> This is not to say that such a showing by the plaintiff will *always* be adequate to sustain a jury's finding of liability. Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred . . . . To hold otherwise would be effectively to insulate an entire category of employment discrimination cases from review under Rule 50, and we have reiterated that trial courts should not treat discrimination differently from other ultimate questions of fact.

*Id.* at 148 (internal citations and quotation marks omitted). In other words, although the *McDonnell Douglas* framework aids in the analysis of a Title VII suit, it is not meant to alter the purpose of Title VII, nor does it insulate an insufficient case from summary judgment, nor does it change what a plaintiff is required to show in proving a violation of Title VII—namely, discrimination. As the Supreme Court stated in *McDonnell Douglas* itself, the purpose of Title VII is "to assure equality of employment opportunities and to eliminate those discriminatory practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens." *McDonnell Douglas Corp.*, 411 U.S. at 800. Title VII is not meant to protect an employee's job simply "'because he is a member of a minority group. Discriminatory preference for any group, minority or majority, is precisely and only what Congress has

proscribed.'" *Id.* (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 430–31 (1971)). Thus, the *McDonnell Douglas* framework should not be applied in a manner that renders it nothing more than an empty pleading formula, allowing every allegation of employer discrimination to get to a jury. The touchstone of the inquiry is whether a reasonable jury could find discrimination. If not, the claim cannot survive a motion for summary judgment.

## III.

Elite claims that its reason for demanding additional documentation from Mr. Zamora was a good faith—even if flawed—attempt to comply with the Immigration Reform and Control Act of 1986. IRCA is relevant here in two respects. First, the statute prohibits the knowing employment of unauthorized aliens and places affirmative burdens on employers to verify the identity and employment eligibility of employees, at the hiring stage, by examining certain documents specified by statute and regulation. *See* 8 U.S.C. §§ 1324a(a)(1)(A)–(B), 1324a(b); 8 C.F.R. § 274a.2(b)(1)(ii) & (v). The statute provides that, at the time of initial hiring, compliance "in good faith with the[se] requirements . . . with respect to the hiring . . . for employment of an alien in the United States . . . establish[es] an affirmative defense that [the employer] has not violated" the above provisions. 8 U.S.C. § 1324a(3). IRCA also makes it unlawful for an employer "to continue to employ [an] alien in the United States knowing the alien is (or has become) an unauthorized alien with respect to such

-12-

employment." *Id.* § 1324a(a)(2). It is this latter obligation—combined with the range of civil and criminal penalties that await employers who violate IRCA, *see id.* § 1324a(e)–(f)—that Elite claims prompted its actions in this case.

Second, IRCA has created employer incentives to protect against the significant disruption that may occur when immigration enforcement agents inspect a workplace and find workers out of compliance. As the then-Acting Deputy Director of United States Citizenship and Immigration Services ("USCIS") explained in recent congressional testimony:

> [O]ne of the primary reasons for a human resources manager to push participation in [a voluntary program for employee verification] was to avoid that moment when the INS would come in and raid the place and take away half the workers, and make it impossible to make any kind of production. That's the kind of event that gets the human resources manager fired, and that's the kind of event that they would try to plan against.[6]

---

[6] Indeed, Mr. Tucker enunciated a concern very similar to this in explaining why he staggered distribution of the memoranda alerting employees of their reported SSN discrepancies:
> [W]e knew that once we started calling these people in, not only they but others that may have had social security numbers that checked out would leave the work force and that if we had a large group of warehouse employees leave at one time, it would have been disruptive. So we set up—originally I was going to call five individuals in each week. But the first week, the first five I called in, they and about five other guys just disappeared the next day. So we slowed the process down to where we were doing like two to three every other week or so.

Tucker Dep. at 37–38.

-13-

*Immigrant Employment Verification and Small Business: Hearing Before the Subcomm. on Workforce, Empowerment, & Gov't Programs of the H. Comm. on Small Business*, 109th Cong. (2006) [hereinafter *Verification Hearing*] (statement of Robert Divine, Acting Deputy Director, USCIS, Department of Homeland Security). As recent events around the country illustrate, this is not an obligation that employers can afford to take lightly.[7]

One of the principal methods of ensuring employee eligibility is verification of Social Security numbers. Indeed, this is the key feature of the federal government's Basic Pilot Program—a voluntary employment eligibility verification system created by Congress in 1997.[8] Employers who participate in

---

[7] On December 12, 2006, Department of Homeland Security officials raided six meatpacking plants across the nation in search of illegally employed immigrants. The action resulted in the arrest of 1,282 workers—nearly ten percent of the targeted company's workforce. *See* Rachel L. Swarns, *Illegal Immigrants at Center of New ID Theft Crackdown*, N.Y. Times, Dec. 14, 2006, at A38. "The action targeted the use of legitimate Social Security numbers by illegal immigrants—what . . . [the] spokeswoman for Immigration and Customs Enforcement[] called 'a massive identity-theft scheme.'" Nicole Gaouette, *Six Meat Plants Are Raided in Massive I.D. Theft Case*, latimes.com, Dec. 13, 2006, at http://www.latimes.com/news/nationworld/nation/la-na-raid13dec13.0.5308699.story?track=rss. *See also* Swarns, *supra* (reporting the Secretary of Homeland Security's intention to "aggressively pursue document-theft rings and the illegal immigrant workers who use them," and reporting his statement that "'when we remove the illegal workers, there's going to be some kind of slowdown'").

[8] *See* Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, §§ 401-404, 110 Stat. 3009, 3009-655 to 3009-665; U.S. Citizenship & Immigration Servs., U.S. Dep't of Homeland Sec., *Report to Congress on the Basic Pilot Program* (June 2004),

(continued...)

Basic Pilot electronically submit information from a newly hired employee's I-9 form—name, date of birth, SSN, citizenship status (if provided)—for comparison with information on the SSA's primary database, irrespective of the facially compliant documents provided by the employee to satisfy I-9 requirements. If the information submitted by the employer matches SSA data, the employer is notified of the employee's verified, eligible status. If the employer-submitted data and SSA records are inconsistent, or if SSA cannot issue verification for some other reason, the employer-submitted information is then checked by USCIS.[9] If eligibility still cannot be established, the government issues a "tentative nonconfirmation," and the employer must notify the employee of the finding. USCIS, U.S. Dep't of Homeland Sec., *Findings of the Basic Pilot*

---

[8](...continued)
http://www.uscis.gov/files/nativedocuments/BasicFINALcongress0704.pdf [hereinafter, USCIS, Report to Congress]; Pilot Programs for Employment Eligibility Confirmation, 62 Fed. Reg. 48309, 48311 (Sept. 15, 1997) ("The Basic Pilot involves separate verification checks (if necessary) of the SSA and [USCIS] databases, using automated systems to verify Social Security account numbers . . . and alien registration numbers."). In 2006, the U.S. Senate and House of Representatives each passed differing versions of a bill that would have made the Basic Pilot Program mandatory for all U.S. employers. *See* Border Protection, Antiterrorism, and Illegal Immigration Control Act of 2005, H.R. 4437, 109th Cong. (2006); Comprehensive Immigration Reform Act of 2006, S. 2611, 109th Cong. (2006).

[9] INS published the procedures for Basic Pilot in 1997. Subsequently, INS transferred from the Department of Justice to the Department of Homeland Security, where its functions are now carried out by USCIS. *See* 69 Fed. Reg. 75997, 75998 (Dec. 20, 2004). Thus, where the 1997 procedures refer to INS, this opinion substitutes USCIS.

*Program Evaluation* 42 (June 2002), at

http://www.uscis.gov/files/article/4%5B1%5D.b%20C_II.pdf [hereinafter USCIS

Findings].  Employees are given eight federal workdays to contact USCIS or SSA

and resolve the problem.  If the employee chooses not to contest the tentative

nonconfirmation, it is considered a "final nonconfirmation" and the employer may

terminate the employee.  If the employee does choose to contact the relevant

agency and the agency resolves the issue, the employee must notify his employer

and the employer must confirm the new result through the Basic Pilot computer

system.  If eligibility is still not established after this period and no further

verification instructions are provided by the SSA, the employer is authorized to

discharge the employee.  *See* USCIS Findings, *supra*, at 40–44; 62 Fed. Reg.

48309, 48312–13.  *See also* USCIS, Report to Congress, *supra* note 8, at 2–3.  If

the employer chooses not to terminate an employee after issuance of a final

nonconfirmation, it must notify USCIS.  Failure to notify constitutes a violation

of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 and

may result in legal penalties.  62 Fed. Reg. 48309, 48313.

Compliance efforts have shifted to Social Security number verification

because of the easy availability of forged documents and the prevalence of

identity theft, which make other forms of documentation less reliable.  At a House

subcommittee hearing on proposed legislation to make participation in the Basic

Pilot Program mandatory, the Chair of the House Subcommittee on Workforce,

Empowerment, & Government Programs explained that "the easy availability of counterfeit documents has made a mockery of [IRCA]. Fake documents are produced by the millions, and they can be bought very cheaply." *Verification Hearing*, *supra* (statement of Rep. Marilyn Musgrave, Chairman); *see also* USCIS Findings, *supra*, at 178, at http://www.uscis.gov/files/article/6%5B1%5D.a%20C_XI.pdf. ("Individuals without work authorization frequently obtain work by using counterfeit or altered documents."). An increasingly common method of circumventing IRCA involves flat-out identity theft, i.e., the "use [of] real documents belonging to another person. For example, individuals may borrow documents belonging to relatives or friends with similar characteristics." USCIS Findings, *supra*, at 179; *see also Verification Hearing*, *supra*, (statement of Jack Shandley, Senior Vice President, Swift & Co.) ("The underground market responded [to a crackdown on counterfeit documents] by replacing counterfeit documents with genuine identification documents obtained under fraudulent terms . . . ."). Reliance on data—SSN, name, birthdate, asserted citizenship status—rather than documents ameliorates this problem.

In his dissenting opinion, Judge Lucero writes at length about the anti-discrimination requirements contained within IRCA, 8 U.S.C. § 1324b(a), despite the fact that Mr. Zamora has not alleged a violation of those provisions. *See* Dissenting Op. at 11–15. Citing the text, legislative history, and implementing

regulations of the IRCA provisions, the dissent seems to imply that our interpretation of Title VII ought to be guided by these provisions. That suggestion is unfounded because—as the dissent acknowledges—the IRCA anti-discrimination provisions were intended to "'broaden[] the Title VII protections against national origin discrimination, while not broadening other Title VII protections.'" *Id.* at 12 (emphasis removed) (quoting H.R. Conf. Rep. No. 99-1000 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5840, 5842). This case arises under Title VII—not IRCA's anti-discrimination provisions—and the principles we interpret will apply across the board to all Title VII claims. It would be contrary to congressional intent for us to "broaden" Title VII by interpreting it to coincide with the IRCA anti-discrimination provisions. To confine our analysis to Title VII does not "go far in insulating employers from national origin discrimination claims," as the dissent charges. *Id.* at 14. It simply respects the different reach of the two different statutes.

## IV.

Turning first to Mr. Zamora's suspension claim, I am at a loss to see how a reasonable factfinder could construe the sequence of events detailed above as discriminatory.

Through Mr. Zamora's suspension on or about May 22, and up to Mr. Tucker's rejection of Mr. Zamora's proffer of a naturalization certificate when he returned later that day or the next, Elite's actions are free of any taint of

-18-

discrimination. When the company learned of the impending INS inspection, Elite undertook an examination of the Social Security numbers of all of its employees, without regard to their race or national origin. When it learned that thirty-five employees had irregularities regarding their Social Security numbers, Elite contacted all thirty-five and asked all thirty-five for documentation that would clear up these issues. Although Mr. Zamora complains that the company put the burden on the employees to prove their identity and eligibility rather than contacting the relevant government agencies itself, this approach was lawful, and more importantly was applied to all affected employees without regard to their race or national origin. No one disputes that the company's outside contractors uncovered evidence of irregularities in Mr. Zamora's SSN. No one disputes that it was lawful for the company to ask Mr. Zamora to clear up the discrepancy. No one disputes that the company gave Mr. Zamora sufficient time—ten days—to do so. And no one disputes that, twelve days after receiving notice, Mr. Zamora had failed to do anything to clear up the problem. At the time when Mr. Zamora was suspended from employment on May 22, therefore, no reasonable juror could find that he had been treated differently from any other employee, on the basis of his national origin. *See Zamora*, 449 F.3d at 1118–19 (Ebel, J., dissenting).

The discriminatory suspension claim arises primarily from Mr. Zamora's allegation that he later presented Mr. Tucker with a certificate of naturalization, and that Mr. Tucker refused to accept it as sufficient resolution of his Social

Security number irregularities. Because Mr. Zamora was the only employee of the thirty-five problem cases to reach this juncture, one cannot determine whether he was treated differently from other employees. But one can examine the circumstances for evidence that would allow a reasonable factfinder to draw an inference of discrimination. I find none.

Mr. Zamora argues that once he produced his naturalization certificate, it should have been sufficient to clear the company of any possible liability under IRCA. Any further requests for documentation, he argues, were inconsistent with the company's stated rationale and thus evidence of pretext. Similarly, Mr. Zamora contends that because the memorandum handed to him on May 10 stated that "eligibility can be established with . . . a Certificate of Citizenship or Naturalization," Mr. Tucker's rejection of such a document is evidence of pretext. Lastly, Mr. Zamora argues that Mr. Tucker's personal demeanor is evidence of discrimination. I do not find these arguments convincing for several reasons.

**A.**

First, Mr. Zamora ignores the critical fact that in addition to presenting Mr. Tucker with his naturalization certificate he also presented him a Social Security document that displayed a birth date different from the one he had previously reported to Elite. *See* Appellant's Supp. App. at 89. This new development understandably heightened Mr. Tucker's suspicion regarding whether the SSN used by Mr. Zamora was legitimately his. The contemporaneous presentation of a

naturalization certificate, which would not contain Mr. Zamora's SSN, would not have resolved the issue. As Mr. Tucker explained:

> [M]y concern with Mr. Zamora was could I find a document or a couple of documents that had the birthdate he was using, the name he was using, and the social security number he was using that verified that this is truly his? And when he brought [in the document with the different birth date,] in addition to the other concern that had been raised with this different birthdate, it appeared to me as if now we had possibly three individuals using this same card.

Tucker Dep. at 64.

It may have been wrong, but it was not unreasonable for Mr. Tucker to believe that, under these circumstances, examination of the naturalization certificate would fail to bring the company into compliance with IRCA. IRCA makes it "unlawful for [an employer], after hiring an alien for employment in accordance with [IRCA's hiring procedures] to continue to employ the alien in the United States knowing the alien is (or has become) an unauthorized alien with respect to such employment." 8 U.S.C. § 1324a(a)(2). Thus, Mr. Tucker may have reasonably believed that while examination of a facially valid naturalization certificate would satisfy Elite's statutory duties at the *hiring stage*, *see* 8 U.S.C. § 1324a(a)(3), once the company was confronted with a *specific* question about a worker's documentation, it was under a duty to investigate and resolve that specific concern.

Indeed, case law interpreting IRCA supports Elite in this view. The Ninth Circuit has held that 8 U.S.C. § 1324a(a)(2) adopts a "constructive knowledge

-21-

standard," whereby "a deliberate failure to investigate suspicious circumstances imputes knowledge" to an employer. *New El Ray Sausage Co. v. INS*, 925 F.2d 1153, 1157–58 (9th Cir. 1991) (citing *Mester Mfg. Co. v. INS*, 879 F.2d 561, 567 (9th Cir. 1989)). As that court explained, employers share "part of [the] burden" of "proving or disproving that a person is unauthorized to work." *Id.* Initial verification at the hiring stage is done through document inspection, but "[n]otice that these documents are incorrect places the employer in the position it would have been if the alien had failed to produce documents in the first place: it has failed to adequately ensure that the alien is authorized." *Id.* Moreover,

> [a]lthough compliance with the paperwork procedures establishes a good faith defense against a finding of unlawful hiring, 8 U.S.C. § 1324a(a)(3), it should provide no defense against a violation of section 1324a(a)(2). While the hiring can be considered in good faith since the false nature of the documents was unknown, the continuing employment is done with the knowledge that the document is false.

*Id.* at 1158 n.7.

Whether or not this Court ultimately agrees with the Ninth Circuit's interpretation—which we need not decide in this case—*New El Ray Sausage* demonstrates that Mr. Tucker's diligence in seeking resolution of all reported SSN discrepancies was within the bounds of reasonableness and, therefore, that his continued focus on resolving Mr. Zamora's SSN problem does not constitute strong evidence of pretext. *See Meltzer v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1178 (10th Cir. 2006) ("'[A] mistaken

belief can be a legitimate reason for an employment decision and is not necessarily pretextual.'" (quoting *EEOC v. Flasher Co., Inc.*, 986 F.2d 1312, 1322 n.12 (10th Cir. 1992)); *Stover v. Martinez*, 382 F.3d 1064, 1076 (10th Cir. 2004) ("[I]n evaluating pretext, the relevant inquiry is not whether [the employer's] proffered reasons were wise, fair or correct, but whether [the employer] honestly believed those reasons and acted in good faith upon those beliefs.") (internal citations and quotation marks omitted); *Reynolds v. School Dist. No. 1, Denver*, 69 F.3d 1523, 1535 (10th Cir. 1995) ("[A]n employer's exercise of erroneous or even illogical business judgment does not constitute pretext."). *See also McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir. 1998) ("Summary judgment is not ordinarily appropriate for settling issues of intent or motivation . . . . However, in this case, McKnight has not shown that at the time of his termination there was any dispute or a genuine issue concerning the sincerity of defendants' proffered reason for his termination.").

Mr. Zamora's position appears to be that whenever an employer has "good" documents on file—that is, documents that facially comply with IRCA and for which questions have not been raised—the employer is barred from pursuing any suspicious circumstances that arise concerning other documents on file. As *New El Ray Sausage* demonstrates, IRCA does not necessarily read that way, and I do not believe an employer should be held

to have discriminated under Title VII for failing to adopt this somewhat surprising reading of its responsibilities. Indeed, if any action beyond facial examination of eligibility documents is discriminatory, then the entire Basic Pilot Program—which is designed to curb the growing problems of document fraud and identity theft—might be called into question, since it is premised on the examination of data discrepancies rather than documents.

In arguing that Elite's proffered reason is pretextual, the dissent rests heavily on a quotation from Mr. Tucker's deposition in which he affirmatively responded to the following question: "So, it wasn't really a concern about whether [Mr. Zamora] is entitled to work in this country, it was a concern about is he using the correct social security number?" Tucker Dep. at 87. The dissent interprets this as a "concession" that Mr. Tucker "was not concerned with Zamora's lawful right to work in this country as of May 22, 2002." Dissenting Op. at 18-19. The statement, however, must be understood in context:

(1) When asked what IRCA requires, Mr. Tucker stated: "Within three days of [an employee's] working for us we have to have documents that establish, one, their identity; and two, their eligibility to work in this country. Sometimes those documents can be one and the same." Tucker Dep. at 17.

(2) In explaining his concern over Mr. Zamora's file, Mr. Tucker stated: "My concern with Mr. Zamora was could I find a document or a couple of documents that had the birthdate he was using, the name he was using, and the social security number he was using that verified this is truly his?" *Id.* at 64.

(3) With this as background, Mr. Tucker was then asked: "So would it be fair to say that the problem with the social security number is that it points to a potential that, in fact, he is not entitled to work in this country?" *Id.* at 87. Mr. Tucker responded: "What I had was a social security number that indicated three different people may have used that number at three different points in time. I wanted to ascertain with certainty that that number belonged to Mr. Zamora." *Id.*

(4) Only then did Mr. Zamora's attorney ask: "So it wasn't really a concern whether he is entitled to work in this country, it was a concern about is he using the correct social security number?," whereupon Mr. Tucker responded, "Yes sir." *Id.*

Mr. Tucker never testified that he was unconcerned with IRCA compliance in general, only that his concern related to Mr. Zamora's SSN rather than any other issues surrounding "entitlement to work in this country." As already discussed, an increasingly common form of IRCA fraud entails the presentation of valid documents that belong to someone

else. Thus, while SSNs are initially used to confirm employment eligibility under IRCA (rather than identity), when an employer learns that a Social Security number has been used by multiple persons, the employer might reasonably be concerned that an employee is not who he purports to be—in other words, that the SSN the employee presents does not match the identity he presents. Consequently, the question relevant to this case is not really one of "eligibility" under IRCA, but rather of the match between identity and proof of eligibility. In Mr. Tucker's words: "What I had was a social security number that indicated three different people may have used that number at three different points in time. I wanted to ascertain with certainty that that number belonged to Mr. Zamora." *Id.* at 64.

The dissent misapprehends the nature of Mr. Tucker's concern, and therefore erroneously concludes that Mr. Tucker was not concerned with IRCA compliance—or more precisely, that Elite's professed concern about IRCA compliance must be a pretext for its real motive: discrimination against persons of Mexican nationality. Mr. Tucker repeatedly explained that he was concerned with Mr. Zamora's reported SSN discrepancy. As detailed above, a reasonable reading of IRCA suggests that when such problems are reported, an employer must resolve them. Read in context, Mr. Tucker's statements—including his "concession"—reflect a concern

with this aspect of IRCA compliance rather than an admission that Mr. Tucker was wholly unconcerned with IRCA.

The dissent objects that my interpretation of Mr. Tucker's remark relies on its "context." Dissenting Op. at 3 n.3, 20, 21 n.13. It asserts that consideration of "contextual hues" will "amount to impermissible inferences drawn in favor of Elite," and implies that on summary judgment a court must disregard such "arguments." *Id.* at 21. Such an approach would depart from well-established principles of Title VII law. As the Supreme Court recently explained:

> [T]he significance of any given act of [employment] retaliation will often depend upon the particular circumstances. *Context matters.* "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed."

*Burlington N. & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405, 2415 (2006) (emphasis added) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81-82 (1998)). Accordingly, this Court frequently examines statements and events in context to determine their legal effect or whether they genuinely create a disputed question of material fact. *See, e.g., Jones v. Barnhart*, 349 F.3d 1260, 1269 (10th Cir. 2003) (considering allegedly discriminatory acts and finding that, "[i]n context, these particular incidents do not appear to be founded in racial enmity"); *Rakity v. Dillon Companies,*

*Inc.*, 302 F.3d 1152, 1163 (10th Cir. 2002) (noting the importance of viewing deposition testimony in its full context and concluding that comments from one portion of a deposition were clarified by comments in another portion and therefore did not raise a genuine issue of material fact); *Curtis v. Okla. City Pub. Sch. Bd. of Educ.*, 147 F.3d 1200, 1215 (10th Cir. 1998) (finding that deposition statements, "placed in context, [did] not support Plaintiff's claim that" his employer "terminated him for no reason" and concluding that he failed to "establish[] a genuine issue of material fact"); *Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1538 (10th Cir. 1995) (viewing allegedly discriminatory comments by co-workers in "context" and affirming summary judgment for defendant); *Ingels v. Thiokol Corp.*, 42 F.3d 616, 623 n.4 (10th Cir. 1994) (viewing a human resource director's testimony "in context" to conclude that it did not constitute evidence of pretext in an age discrimination case), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002); *Ambus v. Granite Bd. of Educ.*, 975 F.2d 1555, 1565 (10th Cir. 1992) (finding that facially "disturbing" deposition testimony, "taken in context," did not constitute the showing of bias needed to support plaintiff's due process claim); *Mella v. Mapleton Pub. Sch.*, 152 Fed. App'x 717, 724–25 (10th Cir. 2005) (unpublished) (reading statements in context to conclude that "no reasonable jury could construe [them] as ageist"); *Shinwari v. Raytheon Aircraft Co.*,

No. 98-3324, 2000 WL 731782, at *10 (10th Cir. June 8, 2000) (Lucero, J.) (unpublished) ("Viewing the entirety of the evidence in context, we conclude that this single isolated inconsistency is not sufficient to undermine the sincerity of Raytheon's professed motive for taking adverse action . . . .") *abrogated on other grounds by Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 269 (2001); *Drake v. Colo. State Univ.*, Nos. 97-1076, 97-1077, 1998 WL 614474, at *5 (10th Cir. Sept. 8, 1998) (unpublished) (finding that, "[p]laced in context," an employer's statements did not constitute evidence of retaliatory motive sufficient to rebut the employer's proffered nondiscriminatory reason).

It would be error to do otherwise. The principle that a court must resolve disputed facts in favor of the nonmoving party does not license the court to disregard undisputed facts, even regarding "context," if those facts would preclude a reasonable jury from finding discrimination. In this case, the context makes clear—and no reasonable jury could find otherwise—that Mr. Tucker was concerned about Mr. Zamora's Social Security number issues as part of the company's IRCA compliance efforts. There is nothing in Mr. Tucker's statements, read in context, that would warrant an inference that his concerns about Mr. Zamora's SSN were a pretext for discrimination.

**B.**

Second, while we have held that pretext can be shown "with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances," *English*, 248 F.3d at 1009, and while it is true that the memorandum issued to Mr. Zamora stated that a naturalization certificate was an acceptable form of proof of identity and employment eligibility, the memorandum also stated that "the documents you provided us previously are questionable." Appellant's Supp. App. at 87. According to Mr. Tucker, when he handed the memo to Mr. Zamora, he "told him through the interpreter that it appeared as if his documentation might have a problem and that he would have ten days to try to resolve *the discrepancy*." Tucker Dep. at 52 (emphasis added). At his deposition, and in his complaint before the Equal Opportunity Employment Commission, Mr. Zamora admitted that "[o]n or about May 10, 2002, my manager asked me to bring again documents to prove *that I had a valid Social Security number* and the right to work in this country." Zamora Dep. at 21–22 (emphasis added). Additionally, the following exchange occurred at Mr. Zamora's deposition:

> Q. Okay. And is it fair to say that you knew you needed to
> bring a valid Social Security number and documents to prove
> the right to work in this country?
> A. Yes.
> Q. And you knew that on May 10th?

A. Yeah.

*Id.* at 22. Thus, although the Elite memorandum, read in isolation, might suggest some sort of inconsistency, when read in context of what was said to Mr. Zamora—and what took place in this case—it does not get Mr. Zamora very far.

## C.

Third, as discussed above, the Supreme Court has held that a showing by the plaintiff that the employer's asserted justification is false will not always be adequate to sustain a jury's finding of liability. *Reeves*, 530 U.S. at 148. The Court offered two examples of when this might be the case. One such example arises when "the plaintiff create[s] only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Id.* As already noted, Mr. Zamora has, at best, created a weak issue of fact as to whether Mr. Tucker was really pursuing IRCA compliance: his attempt to resolve known SSN discrepancies was entirely reasonable under IRCA and relevant case law, and his continued insistence on resolving that problem was consistent with what Mr. Zamora was told about his need to resolve the SSN issue. But more importantly, there is a complete absence of any evidence that Elite harbored any animosity toward persons of Mexican extraction. Quite the contrary. The same employer

-31-

hired other employees of Mexican descent, hired Mr. Zamora knowing he was from Mexico, told Mr. Zamora he would be rehired if he could clear up the SSN problem, and offered to rehire him immediately after verifying his documentation, a mere three days after suspending him.[10] If these actions were a pretext for discriminating against persons of Mexican nationality, it was an exceedingly peculiar way to go about it. *Cf. Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1183 (10th Cir. 2006) ("Most of the same individuals . . . who decided to terminate Antonio for job abandonment had also hired her twice, fully aware of her race and national origin. It makes little sense to deduce that these individuals terminated Antonio roughly ten months later because of her race and/or national origin.").

-------

[10] At his deposition, Mr. Zamora admitted that aside from the rejection of his papers, Mr. Tucker did nothing to suggest an animus toward Hispanics:

> Q. Okay. Did Mr. Tucker tell you that he did not like Hispanic people?
> A. No.
> Q. Did Mr. Tucker tell you that he did not like Mexican people?
> A. No.
> Q. Were there other people that worked in Elite Logistics who were from Mexico?
> A. Yes.
> . . .
> Q. And what are your reasons for believing that Elite discriminated against you because of your national origin? . . .
> A. Because he don't believe me that the papers that I give him was right or mine.

Zamora Dep. at 40–41.

-32-

The Supreme Court's second example of when evidence of inconsistency may not give rise to a finding of pretext occurs when "the record conclusively reveal[s] some other, nondiscriminatory reason for the employer's decision." *Reeves*, 530 U.S. at 148. Here, even if we were to assume that Mr. Tucker was not simply trying to satisfy what he believed were Elite's responsibilities under IRCA, the most that can be said of him is that he was fixated on ensuring that all of Elite's employees had valid SSNs on file and that all reported SSN problems were resolved. Mr. Tucker's actions throughout this process were consistent with this concern and this concern only. His first step was to check all employees' SSNs. When problems were discovered, he pursued each and every one of them to resolution. As soon as Mr. Zamora produced adequate proof of the validity of his SSN, Mr. Tucker asked him to return to work. As already explained, these actions could be consistent with a reasonable interpretation of IRCA. But, even if they were not, they at most reveal a mistaken preoccupation with ensuring that the reported SSN problems get resolved, not some sort of covert plan to target Mr. Zamora because of his ethnicity.

**D.**

-33-

Mr. Zamora also contends that Mr. Tucker's rudeness in reacting to the demand for an apology is indicative of a discriminatory motive. But the record contains no evidence that Mr. Tucker's reaction to Mr. Zamora's request was related to ethnicity. As Mr. Tucker stated in his deposition—explaining why *Mr. Zamora's translator* may have used strong language on Mr. Zamora's behalf—"[f]oul language is quite common [at the Elite] organization." Tucker Dep. at 56. "Title VII is not a general civility code for the American workplace." *Dick v. Phone Directories Co.*, 397 F.3d 1256, 1263 (10th Cir. 2005). Rudeness does not, standing alone, demonstrate discrimination, especially in a warehouse environment where top hats and tails are not the norm. And none of Mr. Tucker's purportedly rude behavior focused upon Mr. Zamora's ethnicity. Indeed, before he called Mr. Zamora into his office on May 10, Mr. Tucker had never met Mr. Zamora. Tucker Dep. at 12. Mr. Tucker summoned Mr. Zamora solely to reconcile a reported SSN discrepancy, and all of Mr. Tucker's conduct towards Mr. Zamora following that incident was based upon that discrepancy.

That Mr. Tucker suspected Mr. Zamora of some form of SSN fraud is scarcely evidence that he was bigoted against persons of Mexican ethnicity or nationality. Mr. Tucker had investigated thirty-four other employees with similar problems and none of them had been able to establish the

-34-

authenticity of their SSNs. Mr. Zamora was last on the list, and it was not unreasonable for Mr. Tucker to expect that he would follow the pattern. It turned out Mr. Zamora was the exception, but that does not mean Mr. Tucker's suspicions were a product of animus.

## V.

Though I agree with Judge Ebel's analysis for the Court as to the dismissal claim, I write to spell out an additional reason why we should affirm the district court on this front. As I understand Mr. Zamora's theory—and that of Judge Lucero in dissent—the circumstances surrounding Mr. Zamora's suspension formed the context for his termination and "it is inappropriate to ignore the former event when analyzing the latter." Dissenting Op. at 2. In other words, if one accepts the theory that Mr. Tucker's previous actions with regard to Mr. Zamora's employment status were motivated by animus toward those of Mexican descent, one must also accept that Mr. Tucker's reaction to Mr. Zamora's demand for an apology was similarly motivated. Mr. Tucker fired Mr. Zamora, the theory goes, not as a reaction to the ultimatum (not even as a disproportionate or even unreasonable reaction), but rather because the demand finally gave Mr. Tucker the cover he needed to rid the company of an employee he disfavored because of his national origin.

The consequences of such a holding would be stark: essentially any victim of a discriminatory adverse employment action that fell short of termination could morph his grievance into a more lucrative wrongful termination claim by presenting his employer with an ultimatum. While appropriate means for opposing workplace discrimination exist—such as internal grievance processes, the Equal Opportunity Employment Commission, or the courts—employee-fashioned ultimatums are not among them. There are a multitude of valid reasons why an employer might not issue an apology on demand, not the least of which is a reluctance to admit legal liability or moral culpability before a claim has been fully reviewed through appropriate channels. If Mr. Zamora's theory holds, employers would face a daunting Catch-22: apologize and perhaps admit the previous violation of the discrimination laws, or fail to satisfy the ultimatum and face potentially increased liability for wrongful termination.[11] Title VII provides employees with a method of remedying acts of discrimination, not with a means of creating them.

## Conclusion

---

[11] Moreover, if the Court were to validate Mr. Zamora's theory, it might mean that an employee could unilaterally turn every claim of discrimination under 42 U.S.C. § 2000e-(2)(a)(1) into a retaliation claim under 42 U.S.C. §2000e-3(a), which makes it unlawful "for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice" under Title VII. 42 U.S.C. §2000e-(3)(a).

For these reasons—in addition to those enunciated in Judge Ebel's opinion, which I join—I would affirm the district court's disposition as to both claims.

04-3205, *Zamora v. Elite Logistics, Inc.*

**GORSUCH**, Circuit Judge, concurring.

I join Judge Ebel's opinion for the Court as well as Judge McConnell's concurrence, with the exception of the discussion in the last paragraph of Section III of the latter opinion regarding the interrelationship between IRCA's anti-discrimination provision and Title VII.

Judge Lucero and Judge McConnell engage in a perhaps unavoidable disagreement over many highly important issues in this difficult case. But on one issue at least, their dispute seems to me unnecessary. Judge Lucero and Judge McConnell debate in some detail whether and to what degree Title VII analysis should be informed by IRCA's anti-discrimination provision (8 U.S.C. § 1324b) and the policies and purposes that provision serves.[1] Yet, as Judge McConnell notes, the plaintiff in this case does not allege a violation of the IRCA anti-discrimination provision. *See* Concurring Op. at 17 (McConnell, J.). In fact, in his opening appellate brief, Mr. Zamora expressly declined to challenge the district court's ruling that IRCA's anti-discrimination provision applies only to "hiring, or

---

[1] Notably, too, this debate is waged primarily with citations to competing snippets of legislative history. *But see Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005) ("Judicial investigation of legislative history has a tendency to become, to borrow Judge Leventhal's memorable phrase, an exercise in looking over a crowd and picking out your friends." (internal quotation omitted)).

recruitment or referral for a fee" and not to decisions, such as in this case, regarding suspension or termination. *See* Appellant's Br. at 21.

Under these circumstances, it is unnecessary for us to address the impact of IRCA's anti-discrimination provision and its underlying policies on Title VII analysis, and I would leave open these matters for resolution another day when the parties before us have reason and opportunity to address them fully. *See generally Bowdry v. United Airlines, Inc.*, 58 F.3d 1483, 1490 (10th Cir. 1995) (citing*, inter alia*, *Headrick v. Rockwell Int'l Corp.*, 24 F.3d 1272, 1277-78 (10th Cir. 1994) (White, J.)). I find it noteworthy that the original panel opinion pursued much the same prudential course. *See Zamora v. Elite Logistics, Inc.*, 449 F.3d 1106, 1113 (10th Cir. 2006). Addressing such a novel legal question for the first time *en banc* and on our own motion – without the benefit of detailed briefing from the litigants affected by our decision, a panel decision on point, or prior opinions from our sister courts – runs the risk of an improvident or ill-advised result given our dependence as an Article III court on the traditions of the adversarial process for sharpening, developing, and testing the issues for our decision. This risk seems to me particularly serious here, where the question addressed is both highly complex and consequential and involves how we are to give proper respect to the directives we have received from Congress in two nuanced and related statutory regimes.

04-3205, <u>Zamora v. Elite Logistics, Inc.</u>

**LUCERO**, J., joined by Judges **HOLLOWAY**, **HENRY**, **BRISCOE**, and **MURPHY**, dissenting.

We granted en banc rehearing in this case to reconsider the panel opinion, <u>Zamora v. Elite Logistics, Inc.</u>, 449 F.3d 1106 (10th Cir. 2006), which dealt with two fact-bound summary judgment issues. First, did Zamora, a United States citizen and apparent victim of identity theft, create a material dispute of fact regarding Elite's motive for Zamora's week-long unpaid suspension, given that, on the first day of his suspension, he produced a naturalization certificate consistent with information already in his employment file? Second, did Zamora create a material dispute of fact regarding Elite's motive for terminating Zamora following his demand for an apology for his suspension?

Anomalously, we are divided seven to seven on whether there is a material dispute of fact regarding the suspension, and thus reinstate the district court's opinion on that point. Notwithstanding that resulting disposition, a bare majority of our court determines that "[human resources manager Larry] Tucker's suspending Zamora and his later decision to terminate Zamora's employment must be viewed as discrete, separate events," although the two incidents happened just four days apart, and holds that Zamora's second claim

fails as a matter of law.  (Maj. Op. 13.)  From the majority's holding on the latter claim, I respectfully dissent.

The basis of my dissent is that neither the facts nor the law lend themselves to a surgical excision of the two issues in the manner espoused by the majority.  Because Zamora's suspension and termination occurred just days apart and were imposed by the same supervisor, it is inappropriate to ignore the former event when analyzing the latter.

I continue to think it unnecessary to examine the suspension claim in detail because, under our circuit practice, we affirm the district court's decision without opinion when we evenly divide on the disposition of a claim.  Nonetheless, because Judge McConnell's concurrence[2] chooses to discuss the issue at length, this dissent responds to the McConnell concurrence as well.

**I**

This appeal stems from a grant of summary judgment in favor of Elite on both Zamora's suspension and termination claims.  "We review the district court's grant of summary judgment de novo, applying the same legal standard

---

[2] Because we have split evenly on the disposition of Zamora's suspension claim, the court has issued no opinion to which a concurrence may properly be addressed, particularly so given that the "concurrence" is directly contrary to the vote on the suspension claim of the author of the majority opinion.  I find no precedent for the issuance of a concurrence to an evenly divided en banc judgment.  Notwithstanding disagreement with the characterization of Judge McConnell's discourse as a concurrence, this dissent refers to Judge McConnell's discussion of the suspension claim as "the concurrence."

-2-

as the court below."  Munoz v. St. Mary-Corwin Hosp., 221 F.3d 1160, 1164

(10th Cir. 2000).  Summary judgment is only appropriate "if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with

the affidavits, if any, show that there is no genuine issue as to any material fact

and that the moving party is entitled to a judgment as a matter of law."  Fed. R.

Civ. P. 56(c).  It is our obligation on appeal to view the evidence and draw

reasonable inferences therefrom in the light most favorable to Zamora, the

nonmoving party.  Munoz, 221 F.3d at 1164.  Making these inferences, the

facts are as follows.[3]

In 1987 Zamora was granted legal permanent residency in the United

States.  In August 2001, he was hired by Elite.  At that time, Zamora provided

Elite with a copy of his social security card and his alien registration card, and

---

[3] The concurrence implicitly argues this dissent incorrectly portrays "a hapless employee repeatedly offering sound documentation of his work status, and just as often being senselessly (or invidiously) rebuffed."  (Concurring Op. 2.)  On the contention that this "is scarcely a fair description of what occurred," (id.), it then advances an alternative factual scenario.  The concurrence depicts an employer attempting to comply with the Immigration Reform and Control Act of 1986 ("IRCA") and to maintain operations after it faced a worker strike which "necessitated the rushed hiring of about three hundred replacement employees," (id. at 2-5), and an employee who ignored the company's minimal requests.

For the most part, I do not disagree with the concurrence's description of the events leading up to Zamora's initial meeting with Tucker.  We mainly differ, however, in our portrayal of the events after this meeting.  Both find factual support in the record, but this dissent makes reasonable inferences as required by law, while the concurrence advances the defendant's view of the facts.  Using the term "context," the concurrence discredits evidence that a reasonable juror could view as supporting Zamora.  In my view, these contextual arguments are simply impermissible inferences.

-3-

completed an I-9 form attesting that he was a Mexican citizen and lawful permanent resident of the United States. While working for Elite, Zamora became a naturalized citizen.

In December 2001, after receiving a tip that the Immigration and Naturalization Service ("INS") might inspect its Kansas City location, Elite hired two independent contractors to check the social security numbers ("SSNs") of all employees at that location.[4] Tucker testified approximately thirty-five or so employees, including Zamora, were identified as having problems as a result of these investigations. A Datasource "Background Investigation Report" revealed that an individual in California had used Zamora's SSN. (Appellee App'x 94, 96.) A second contractor, Verifications, Inc., informed Elite that Zamora's SSN had "been used by someone else for credit purposes," and instructed Elite that "[v]erification through the Social Security Administration itself can only be done by the company that has hired the applicant, by calling 800-772-1213." (Id. at 97.) Tucker chose not to verify Zamora's social security status by calling this number at the time. Nor did he bother to look at Zamora's employment file, which contained Zamora's I-9 work authorization form and copies of his social security card and alien

---

[4] In response to a Summer 2000 worker strike, Elite hurriedly hired approximately 300 replacement employees. During this time, it operated under a "get a body in the door" policy that blatantly disregarded IRCA requirements.

-4-

registration card, at any point during the ensuing events. Instead, he presented

Zamora with the following memorandum on May 10, 2002:

> It is required by federal law that all employees produce documents, which establish their identity and/or employment eligibility to legally work in the United States when they are hired. This eligibility can be established with a US Passport, a Certificate of Citizenship or Naturalization; or with a combination of other documents, such as a state driver's license, state or federal ID card, US Social Security card and/or a certified copy of a birth certificate, issued by a state of the United States.
>
> It has come to our attention that the documents you provided us previously are questionable. Therefore, we are asking that you obtain proper documentation, or you may not be permitted to continue working here. Please bring proper evidence of your identity and employment eligibility no later than 5:00 p.m. on Monday, May 20, 2002, to the Department of Human Resources, or you may be terminated.
>
> Thank you.
>
> (Appellant Supp. App'x 87.)

Under a part titled "Eligibility Documentation," the memorandum continued:

> I understand and agree that until and if I provide documents, which establish my identity and/or employment eligibility to legally work in the United States, Elite Logistics may not be able to continue permitting me to work. I also understand and agree that I have until 5:00 p.m. on Monday, May 20, 2002, to produce this documentation.
>
> (Id.)

Although Zamora did not provide the requested documentation by May

20, he attempted to comply with Elite's request immediately after Tucker

-5-

suspended him on May 22, thereafter presenting additional materials on numerous occasions.[5] On the day of his suspension, Zamora presented Tucker with a report of his earnings from the Social Security Administration ("SSA"), his social security card, and an INS document showing that he had applied to become a naturalized citizen in 2001. The INS form provided a customer service number, but Tucker did not call that number. The SSA earnings report issued for an "R. Zamora" listed a birth date of "2/1960," conflicting with the document plaintiff had provided to Elite when hired, showing a birth date of June 14, 1961. By Tucker's own admission, receipt of these documents alleviated his concern about Zamora's right to work in this country.

Nonetheless, Tucker chose not to end Zamora's suspension without pay and instead demanded more documentation, allegedly due to Tucker's concerns about the birth-date discrepancy between Zamora's SSA earnings record and Elite's files. Zamora returned to Elite once again with a copy of his naturalization certificate, a document that Elite had identified as sufficient to show lawful work status in its May 10 memorandum.[6] Tucker not only rejected

---

[5] The exact order of the following events is unclear from the record, but, as did the district court, this dissent assumes the order occurred in the light most favorable to Zamora.

[6] Tucker testified that he did not recall receiving this document; Zamora, however, vigorously asserts that he presented Tucker with a naturalization certificate. Because we view the facts in the light most favorable to Zamora, we assume that he did so. As required by statute, a naturalization certificate must

(continued...)

-6-

this certificate; he accused Zamora of stealing someone else's SSN and told Zamora to bring a different social security number than provided at hiring. Finally, Zamora brought in a letter from the SSA bearing the stamp of the agency and verifying that the SSN he provided was assigned to "Ramon Zamora Farias," the name Zamora had given Elite at hiring. Once again, Tucker was not satisfied. Only after Tucker had his secretary confirm the legitimacy of this letter by then placing a phone call to the SSA, did he allow Zamora to return to work.

On May 29, Zamora entered Tucker's office and handed him a letter that demanded both an apology and an explanation. Tucker described Zamora as "very polite" in tendering this letter. Although fully cognizant that Zamora had been lawfully entitled to work during his entire week-long suspension, Tucker refused to apologize, fired Zamora, then instructed him to "get the hell out." Later, Tucker testified that he was "shocked" that Zamora would request an apology and never bothered to consider why Zamora would desire an apology.

## II

Congress enacted Title VII to "eliminate those discriminatory practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens." McDonnell Douglas Corp. v. Green, 411

---

[6](...continued)
include a photograph and the age of the naturalized person. 8 U.S.C. § 1449.

U.S. 792, 800 (1973). Because it is so difficult to ferret out national origin bias,

we must often rely on circumstantial evidence in deciding such claims.

However, the persuasive value of such evidence cannot be discounted.

"Circumstantial evidence is not only sufficient, but may also be more certain,

satisfying and persuasive than direct evidence." Rogers v. Mo. Pac. R., 352

U.S. 500, 508 n.17 (1957); see also Desert Palace, Inc. v. Costa, 539 U.S. 90,

100 (2003).

For both Zamora's suspension and termination claims, we follow the

three-step framework set forth in McDonnell Douglas for summary judgment

cases based on circumstantial evidence. A plaintiff must first plead a prima

facie case of a discriminatory employment action. Thereafter, the burden shifts

to the employer "to articulate some legitimate nondiscriminatory reason for the

employee's rejection." Id. at 802. Once the employer does so, the plaintiff

must offer evidence showing that the proffered reason is pretextual.

Although half of the members of this court agree that Zamora presented

sufficient evidence of pretext as to his continued suspension, the majority

opinion concludes that the record contains no evidence that Tucker terminated

Zamora because Zamora was a "Mexican-born Hispanic." (Maj. Op. 13.) This

ignores the events surrounding Zamora's suspension, which had ended a mere

four days before. We have stated that "evidence of the employer's general

discriminatory propensities may be relevant and admissible to prove

-8-

discrimination." Mendelsohn v. Sprint United Mgmt. Co., 466 F.3d 1223, 1226 (10th Cir. 2006). Moreover, "[e]vidence of pretext may include . . . prior treatment of plaintiff." Garrett v. Hewlett-Packard Co., 305 F.3d 1210, 1217 (10th Cir. 2002) (quotation omitted). I fail to understand how we can be evenly divided over whether Tucker was motivated by racial bias against Mexican-Americans on May 25, and yet issue a majority opinion concluding that Tucker had no racial motivations as a matter of law on May 29.

The majority cites our recent decision in Antonio v. Sygma Network, Inc., 458 F.3d 1177, 1183 (10th Cir. 2006), for the proposition that Tucker's decision to allow Zamora to return to work raises a "strong inference that the employer's stated reason for acting against the employee is not pretextual." (Maj. Op. 13.) From there, the majority jumps to the conclusion that "Tucker's suspending Zamora and his later decision to terminate Zamora's employment must be viewed as discrete, separate events." Id. At no point in Sygma Network did the court so hold. In fact, the guiding principals underlying the holding of Sygma Network are that an individual can be assumed to maintain the same views for a relatively short period in time, and that decisions proximate in time and made by the same person may be viewed to establish common context. Zamora's suspension, permission to return to work, and termination all took place within a span of days and were all decided by Tucker. Thus, notwithstanding the grant of permission to return to work, there

-9-

is no principled reason to view the suspension and termination as "discrete, separate events." Unlike the instant case, the plaintiff in Sygma Network offered no evidence that her employer engaged in arguably discriminatory conduct towards her just days before the termination.[6] When such evidence exists, Sygma Network offers no guidance.

Even more problematic is the majority's bald assumption, again purportedly underpinned by Sygma Network, that "[i]f Tucker was discriminating against Zamora based upon his race or national origin, Tucker would not have reinstated him." (Maj. Op. 13.) This statement is not only speculative, but also permits employers to easily insulate themselves against discriminatory termination claims. Under the majority's formulation, an employer who wished to fire an employee for invidious reasons could do so without fear of legal action simply by suspending and reinstating the employee before terminating him. To the extent that the majority holds that Tucker's grudging permission for Zamora to return to work cleans the slate of all

---

[6] Although the plaintiff produced evidence that her supervisor made an arguably racial comment regarding the plaintiff's body odor ten months prior to termination, we held that this remark was an isolated comment too remote in time to overcome pretext. Sygma Network, 458 F.3d at 1184. In Zamora's case, the suspension without pay was more significant than an isolated comment with no adverse consequences and occurred just days before his termination.

-10-

evidence of discriminatory motive, including the circumstances surrounding Zamora's suspension, I disagree.[7]

### III

Although the concurrence would hold that Zamora's suspension claim fails as a matter of law, in my view Zamora has presented sufficient evidence to survive summary judgment on this claim. The parties do not dispute that Zamora has satisfied the first step of McDonnell Douglas by pleading a prima facie case of discriminatory suspension. Therefore, the burden shifted to Elite to articulate a legitimate nondiscriminatory reason for its actions. Elite contends it was merely attempting to comply with IRCA in suspending Zamora for approximately a week without pay. This case is accordingly decided at the last step of McDonnell Douglas, in which Zamora must offer evidence showing that the proffered reason is pretextual.

### A

Because Tucker effectively conceded that his actions were not driven by IRCA – he admitted he no longer had concerns about Zamora's right to work in

---

[7] The concurrence expresses concern that our approach would allow "essentially any victim of a discriminatory adverse employment action that fell short of termination [to] morph his grievance into a more lucrative wrongful termination claim by presenting his employer with an ultimatum." (Concurring Op. 36.) I share neither the concurrence's fear of the consequences of this dissent's suggested holding nor its jaundiced view of Title VII plaintiffs. In this case, Zamora was fired before he could resign. Had Zamora resigned, he could not have established a prima facie case of wrongful termination under Title VII.

-11-

this country as of May 22, 2002 – I see little merit in providing an in-depth discussion of the statute.  Nevertheless, because I differ greatly from the concurrence in my view of IRCA's requirements and restrictions, I briefly outline my thoughts on this matter.

IRCA was designed to curb the influx of undocumented immigrants by creating a regime of sanctions against employers that hire them.  Toward this end, the Act requires employers to verify the identity and eligibility of employees at the time of hiring by examining certain documents.  8 U.S.C. § 1324a(a)(1)(B), (b).   Well-meaning employers are provided with significant legal protection at the hiring stage because they are allowed to assert "good faith" compliance with IRCA as an affirmative defense to liability.  Id. § 1324a(a)(3).  IRCA also declares that  requesting "more or additional documents" at hiring than those specifically identified in the Act "shall be treated as an unfair immigration-related employment practice."  Id. § 1324b(a)(6).  After the employment relationship is established, IRCA makes it unlawful to "continue to employ [an] alien in the United States knowing the alien is (or has become) an unauthorized alien with respect to such employment."  Id. § 1324a(a)(2).

Employer sanctions, however, represent only one side of the IRCA coin. When IRCA was initially debated, advocates and members of Congress voiced widespread concerns that the Act would become a tool of invidious

-12-

discrimination against Hispanic-Americans and other minorities.  Although the original bill introducing IRCA did not contain strong anti-discrimination measures, the full House voted to include a significant anti-discrimination amendment.  See H.R. Rep. No. 99-682(II) (1986), pt. 2, at 12 (1986), reprinted in 1986 U.S.C.C.A.N. 5757, 5761.  Explaining its support for this amendment, the House Committee on Education and Labor stated:

> The [committee] strongly endorses [the anti-discrimination amendment] and . . . has consistently expressed its fear that the imposition of employer sanctions will give rise to employment discrimination against Hispanic Americans and other minority group members.  It is the committee's view that if there is to be sanctions enforcement and liability there must be an equally strong and readily available remedy if resulting employment discrimination occurs.
> Id.

In adopting the House amendment to the bill, the Joint Senate and House Conference Committee ("Conference Committee") agreed "[t]he antidiscrimination provisions of this bill are a complement to the sanctions provisions, and must be considered in this context."  H.R. Conf. Rep. No. 99-1000 (1986), reprinted in 1986 U.S.C.C.A.N. 5840, 5842.   It went on to explain that the provisions "broaden[ ] the Title VII protections against national origin discrimination, while not broadening the other Title VII protections, because of the concern of some Members that people of 'foreign' appearance might be made more vulnerable by the imposition of sanctions."  Id. (emphasis added).

-13-

Because members of Congress believed that IRCA might not in fact prompt employers to discriminate and the anti-discrimination provisions could thus be unnecessary, the Conference Committee adopted a clause providing, "[t]he antidiscrimination provisions would . . . be repealed in the event of a joint resolution approving a [General Accounting Office] finding that the sanctions had resulted in no significant discrimination." Id. at 5843; see 8 U.S.C. § 1324b(k)(2). In 1990, the General Accounting Office ("GAO") released a report to Congress, finding IRCA had indeed resulted in a "serious pattern" of national origin discrimination. GAO, Employer Sanctions and the Question of Discrimination 5 (1990) ("GAO estimates that 461,000 (or 10 percent) of the 4.6 million employers in the survey population nationwide began one or more practices that represent national origin discrimination."). Thus, IRCA – as enacted, and as it stands today – declares that "[i]t is an unfair immigration-related employment practice for a person or other entity to discriminate against any individual . . . with respect to the hiring, or recruitment or referral for a fee, of the individual for employment or the discharging of the individual from employment . . . because of such individual's national origin."[8] 8 U.S.C. § 1324b(a)(1)(A).[9]

_____

[8] Although the concurrence looks to numerous external sources, including the New York Times, to illuminate the purposes and effects of IRCA, it neglects to carefully consider the anti-discrimination provisions of IRCA itself. It maintains that because "Zamora has not pursued" the administrative procedures

(continued...)

-14-

The concurrence would go far in insulating employers from national origin discrimination claims. It suggests that because employers face sanctions for knowingly continuing to employ unauthorized aliens, employers should be given a virtual safe-harbor against Title VII claims for investigating an employee, so long as they cite IRCA to defend their actions. Assuredly, employers should undertake meaningful investigation if an employee's lawful work status is legitimately called into question. However, fear of sanction for "knowing" employment of unauthorized aliens cannot justify discriminatory precautionary measures. Indeed, regulations implementing IRCA expressly warn employers:

> Knowledge that an employee is unauthorized may not be inferred from an employee's foreign appearance or accent. Nothing in [the definition of knowing] should be interpreted as permitting an employer to request more or different documents than are required under section 274A(b) of the Act or to refuse to honor documents tendered that on their face reasonably appear to be genuine and to relate to the individual.

---

[8](...continued) set forth in § 1324b, "[t]hese provisions are thus not at issue in this case." (Concurring Op. 14, n.7.) IRCA expressly provides that these procedures apply only to claims that cannot be brought under Title VII. 8 U.S.C. § 1324b(a)(2)(B). Although I agree that the anti-discrimination provisions have not been directly placed at issue in this case, these provisions are indispensable in any serious discussion of the Act.

[9] I do not suggest that IRCA's anti-discrimination provisions necessarily guide our analysis. This dissent merely points out that allowing employers to cite IRCA concerns as a shield against Title VII claims is not contemplated by IRCA itself.

-15-

8 C.F.R. § 274a.1(1)(2).[10]

Adopting the concurrence's approach would undoubtedly narrow the scope of recovery for national origin discrimination claims. This result thwarts Congress's clear intent in passing IRCA to "broaden[ ] the Title VII protections against national origin discrimination" and to prescribe a "strong and readily available remedy" for such discrimination. H.R. Conf. Rep. No. 99-1000 (1986), reprinted in 1986 U.S.C.C.A.N. 5840, 5842; H.R. Rep. No. 99-682(II) (1986), pt. 2, at 12 (1986), reprinted in 1986 U.S.C.C.A.N. 5757, 5761. Due consideration of IRCA does not and should not preclude examination of whether Zamora presented evidence sufficient to reach a jury on his Title VII

---

[10] As the concurrence notes, some courts have held that employers violate § 1324a(a)(2) when they have "constructive knowledge" of an employee's unauthorized work status and yet continue to employ that individual. See, e.g, New El Ray Sausage Co., v. INS, 925 F.2d 1153, 1157-58 (9th Cir. 1991). However, no court has held that a credit check revealing only that an employee's SSN was used by another person constitutes "constructive knowledge" of a person's unauthorized work status. Nor do the government's actions under IRCA support this broader view of "constructive knowledge." The concurrence suggests that the government's adoption of social security verification in its Basic Pilot Program supports Elite's actions. (Concurring Op. 15-18.) To the contrary, this argument ignores significant differences between the government's Basic Pilot Program, which requires employers to verify employee SSNs with the federal government, and the ad hoc approach used by Elite. At no point before Zamora's suspension did Elite or anyone else attempt to verify Zamora's SSN by contacting the Social Security Administration ("SSA"). Instead, Elite hired independent contractors to run checks on his SSN information. Only the SSA can conclusively identify the proper holder of a given SSN – recognizing this, the independent contractor employed by Elite instructed the company to verify the number with the SSA and provided a telephone number for the agency.

-16-

claims.

**B**

As explained above, this case is decided at the last step of the

McDonnell Douglas framework.  At this stage we determine whether a plaintiff

has produced sufficient evidence from which a jury could conclude that the

employer's proffered reason for the adverse employment action is pretext."[11]

Pretext may be established by showing "such weaknesses, implausibilities,

inconsistencies, incoherencies, or contradictions in the employer's proffered

legitimate reasons for its actions that a reasonable factfinder could rationally

find them unworthy of credence and hence infer that the employer did not act

for the asserted non-discriminatory reasons."  Morgan v. Hilti, Inc., 108 F.3d

1319, 1323 (10th Cir. 1997) (quotations and citations omitted).  Although there

is no standard method for proving pretext, plaintiffs generally rely on three

types of evidence:  (1) evidence that the defendant's proffered reason was false,

(2) evidence that the defendant acted contrary to a written company policy

prescribing the action to be taken by the defendant under the circumstances, or

(3) evidence that the defendant acted contrary to an unwritten policy or

---

[11] Contrary to the concurrence's suggestion, a showing of pretext alone will generally suffice.  See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 148 (2000) ("[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."); Randle v. City of Aurora, 69 F.3d 441, 451-53, 452 n.16 (10th Cir. 1995).

contrary to company practice when making the adverse employment decision affecting the plaintiff. Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1230 (10th Cir. 2000).

Zamora has consistently argued that Elite's proffered reason for his suspension – a desire to verify Zamora's right to work in the United States – is pretextual. In support of his allegation of pretext, he identifies four pieces of evidence. First, Zamora points to Tucker's own admission that concern over Zamora's right to work did not underlie his decision to continue Zamora's suspension. Zamora contends that this admission demonstrates that Tucker did not have a good faith belief in the proffered justification of IRCA compliance. Second, Zamora notes that Elite's May 10, 2002 written memorandum informed him that a naturalization certificate would be sufficient to clear up concerns over his work status. In rejecting Zamora's proffer of a naturalization certificate, Elite thus violated its own written policy. Third, although a neutral decisionmaker would realize the fact that someone else had used Zamora's SSN did not resolve whether Zamora was the perpetrator or the victim of identity theft, Zamora testified that Tucker accused him of stealing someone else's SSN despite Zamora's protestations to the contrary. Tucker's immediate conclusion that Zamora stole his SSN could reasonably support an inference of discriminatory intent on the part of Tucker. Finally, Zamora has shown that Elite has acted contrary to its alleged good-faith attempt to comply with IRCA,

-18-

even during the period of his suspension.  After Zamora vigorously asserted that his original social security number was correct and true, Tucker instructed Zamora to return to him with a different SSN.  Together this evidence demonstrates "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Elite's proffered reason of IRCA compliance, such that a reasonable factfinder could find that reason "unworthy of credence."  Morgan, 108 F.3d at 1323.

The concurrence ignores the last two showings in its discussion and seeks to discredit the first two pieces of evidence by interpreting them in "context."  The concurrence first attempts to undermine Tucker's admission.  On this point, Tucker testified:

Q:  And the reason [a document from the INS that shows Zamora applied for naturalization did not satisfy you] is because it does not explain away the concerns you had about his social security number?

A:  That is correct.

Q:  Okay.  So would it be fair to say that the problem with the social security number is that it points to a potential that, in fact, [Zamora] is not entitled to work in this country?

A:  What I had was a social security number that indicated three different people may have used the number at three different points in time.  I wanted to ascertain with certainty that that number belonged to Mr. Zamora.

Q:  Okay.  So, it wasn't really a concern about whether [Zamora] is entitled to work in this country, it was a concern about is he using the correct social security number?

-19-

A:  Yes, sir.

(Appellant Supp. App'x 67.)  Making all reasonable inferences in favor of Zamora, this exchange may be reasonably interpreted as a concession by Tucker that he was not concerned with Zamora's lawful right to work in this country as of May 22, 2002.  Tucker's answers to both the second and third questions demonstrate that he viewed his concern with Zamora's lawful work status as distinct from a concern with the validity of his SSN.[12]  From this

[12] Other evidence in the record corroborates that Tucker did not equate his concern about an incorrect SSN with concern over Zamora's showing of identity under IRCA.  Tucker testified that an employee could establish identity for the purposes of IRCA by presenting a valid document with a photograph:

Q:  So if you have a driver's license or some other kind of approved document with your photograph on it, that might comply with the identification requirement, correct?

A:  That is correct.

Q:  But that would not necessarily comply with the right-to-work requirement?

A:  That is correct.

Q:  And for the right-to-work requirement, there are other documents set out in the I-9 form that are acceptable for an employer?

A:  Yes, sir.

Q:  And one of those is a social security card issued by the Social Security Administration?

A:  That's correct.

(continued...)

-20-

exchange, a reasonable factfinder could determine that Tucker was not concerned about Zamora's right to work when he prolonged Zamora's suspension.

Although it cannot escape Tucker's own admission, the concurrence appears to argue: (1) because Tucker had concerns about whether Zamora was using someone else's SSN, Tucker must have doubted Zamora was the person identified by his documents; and (2) because IRCA mandates an employer to confirm both identity and work eligibility, Tucker's SSN concern was equivalent to his concern over IRCA compliance. (Concurring Op. 25-29.) Both arguments are justified by the concurrence as providing "context." However, attributing this understanding to Tucker requires a tortured reading of his deposition testimony. It is true that IRCA necessarily concerns an

---

[12](...continued)
(Appellant Supp. App'x 51.) Tucker later emphasized that he understood that identity theft did not implicate a person's right to work:

> Q: Okay. Would you agree with me that it was also possible that somebody else was illegally using Mr. Zamora's social security number.
>
> A: Yes, sir. It's entirely possible.
>
> Q: If that was the case, then that would not affect his right to work or should not affect his employment status at Elite at all, should it?
>
> A: That is correct.

(Appellant Supp. App'x 72.)

individual's identity, to the extent that an employee must establish that she is the person named in her work-authorization document. But unless Tucker believed that the work-authorization documents presented by Zamora on May 22, 2002 in fact identified Zamora, his concern over Zamora's right to work could not reasonably have been alleviated by those documents. Tucker clearly stated that as of May 22, 2002, he was not concerned about Zamora's right to work in this country but was concerned about Zamora's use of a correct SSN. To conflate these concerns ignores both Tucker's testimony and our obligations to the non-moving party at the summary judgment stage.

In addition, the concurrence also attempts to explain away the fact that Elite contravened written policy in rejecting Zamora's proffer of a naturalization certificate. It concedes that "the Elite memorandum, read in isolation, might suggest some sort of inconsistency," but proceeds to draw inferences and make arguments in favor of Elite. (Concurring Op. 30-31.) Because the memorandum noted that Zamora's documents were questionable, and because Zamora was told he needed to clear up the "discrepancy," the concurrence claims inconsistency between Tucker's actions and the memorandum should be overlooked.

The contextual hues lent by the concurrence amount to impermissible inferences drawn in favor of Elite.[13] Although these arguments may persuade a jury, our role as judges at the summary judgment stage requires us to accept Zamora's competing, plausible interpretations of the evidence. Because I differ with the concurrence in considering the facts in the light most favorable to Zamora, I conclude that a reasonable jury could find Elite's proffered reason of IRCA compliance is pretextual.

Judges Holloway, Henry, Briscoe, and Murphy join in this dissent.

---

[13] I do not suggest that deposition statements should never be considered in context. In fact, the deposition testimony in footnote twelve of this dissent is cited to provide context for Tucker's statement admitting that he no longer had concerns over Zamora's right to work and drawing a distinction between that concern and the SSN issue. However, the concurrence improperly cites context to discredit showings of pretext that reasonably support the non-moving party, even in light of all the evidence.